MEMORANDUM OF DECISION
On May 8, 1999, the Department of Children and Families, hereafter "DCF", filed a petition to terminate the parental rights of Paula K. and James G. to their daughter, Jamie G., now two years and seven months old. Trial of the termination petition took place over three days, March 17, 18 and 25, 1999. For the reasons stated below, the court grants the termination petition. From the evidence presented, the court finds the following facts:
 A. FACTS 1. Events prior to the removal of the child.
Jamie G. was born on August 31, 1996 and was the fourth child born to her mother and the first to her father, James G. At that time, Paula's older children were in the care of their respective fathers. Paula's relationship with the father of her youngest child began in 1993. Both he and she used both alcohol and drugs during their time together. Their substance abuse had reduced their circumstances at the time of the child's birth to residence in a two room motel unit with inadequate cooking facilities. They were about to be evicted due to a foreclosure on the complex and their failure to pay rent. On March 8, 1997, when Paula and James had both been drinking, they had a heated argument and Paula left the motel. James then called DCF. James wanted his daughter placed in foster care, admitted he could not care for his CT Page 3937 daughter and told DCF that there was not enough food for the child. At that time, he thought Paula had left to be with another man. DCF invoked its ninety-six hour hold and secured an order of temporary custody on March 12, 1997. Jamie has been in foster care with the same family since her removal from her biological parents. She was adjudicated a neglected child on April 21, 1997 and committed to DCF for a period of twelve months and her commitment has been extended since that time.
Paula's early history shows that she managed outwardly to cope with her own childhood parenting disruptions well. She testified that she was placed in care herself when she was an infant and has only recently begun to repair her relationship with her alcoholic mother. She was raised by her father, whom she stated she never really knew, and her grandmother. Nonetheless, she graduated from high school, took some community college courses and then began her employment. In 1978, she married Kenneth K. and her oldest child was born during the years of this marriage, which ended in 1983. In 1986 she had a relationship which resulted in the birth of twins, who lived with her until they were seven years old, in 1991. They then went to live with their father. She and their father share joint custody of these children.
In 1993, when she was thirty-eight years old, she began her relationship with James G., Jamie's father, and both engaged in active drug and alcohol abuse. When questioned at trial about domestic violence between them, Paula stated that she and James never had a problem unless they were using drugs or alcohol. Paula testified that DCF became involved with the family in October, 1996.
The inter-generational difficulties which Paula reported in her own family history also evidence themselves in James G.'s background. His parents were active alcoholics, and when he was nine years old, he was placed in the State Receiving Home and then in multiple foster homes. He did not graduate from high school, completing only the eight grade and began at that time as an early adolescent to experiment with drugs and alcohol. After an adverse drug reaction, he was psychiatrically hospitalized and reports that he was then diagnosed as a "manic depressive" and placed on medication, which he did not continue. He appears not to be close to any extended family or to have any other personal supports. He has never been married and Jamie is his first child. He is now forty-four years old. CT Page 3938
DCF referred the couple to counseling and always spoke to them about their ongoing need for substance abuse treatment. Paula testified to her growing desperation concerning housing in early 1997. She and James had no income other than what assistance they could secure. They had no funds for a security deposit and were unable to locate housing other than the motel unit in which they lived. Neither was employed at that time. She stated that she was not well and nervous about leaving a small infant with someone else. No reason was given for James's lack of employment. She stated she and James did not want to live in the apartments that were available through the state program of vouchers as she knew most landlords would not rent to them under such a program. Calvin Williams, the DCF social worker, testified that he tried to help the family with referrals to the Department of Social Services. He testified that housing and rental assistance is not part of DCF's function, but that he made what calls and referrals where he could. From the evidence, the court concludes that unfortunately the parents depression and drug and alcohol abuse during this time rendered them incapable of making reasonable plans to deal with their difficult circumstances and to provide for their daughter.
 2. Events after March 12, 1997.
After Jamie was placed in foster care, Paula and James left the motel unit and began to reside in shelters, who provided them with some assistance regarding services and substance abuse treatment. Whether the referrals were made by DCF or by the support staff in the shelters, as claimed by the parents, Paula and James attended a parenting program at Manchester Memorial Hospital. The "Parent Education and Family Management Program" there had three series of programs. Series I was an eight week program with a support group. Series 2 was a program concerning living skills and covered nutrition, budgeting, hygiene and home safety. Both Paula and James began this program in July 31, 1997 and completed Series I and attended one of the four sessions for series 2. Neither of them completed Series 3.
Paula and James were referred for substance abuse treatment as well. Paula testified that neither she nor James had any individual or family counseling at this time and that finances remained a problem for them. She stated she attended a workshop concerning employment and also went to AA and NA meetings regularly. She began a drug treatment program at Hillcrest, she CT Page 3939 stated, that she did not feel was right for her and which she left. It was a program for substance abusers with mental health problems and many were so medicated she could not communicate with them. At the end of May, Paula left the program, against the advice of the staff and knowing she would be discharged from the shelter in which she was residing. A week later she entered the Blue Ridge treatment program on June 5, 1997, which she completed after a week inpatient and then twenty-eight days of outpatient treatment. Thereafter she attended a continuing care group for eight or nine more weeks which met once a week. Despite this, she stated, she relapsed in October 1997. After that, she considered long term in patient treatment at Milestone, where she could have had her child with her. She stated that around this time James was incarcerated and she was alone and very scared. She said she had no money and she was falling apart. Once she learned there was a waiting list for the Milestone program, she made no further attempts to enter the program or any other drug treatment program.[2] From the summer of 1997 to June of 1998, she was not in any drug treatment program nor were there any further referrals for such treatment.
In February of 1998, she and James attended a DCF meeting concerning DCF's plan to file a termination petition. She admitted that at all meetings DCF spoke to them about the need for substance abuse treatment. By February, 1998, neither she nor James had been in any treatment for over six months. Shortly after this meeting, on March 3, 1998, at a hearing on the extension of commitment for Jamie which neither parent attended, the court found that continuing reunification efforts were no longer appropriate. This finding was not contested nor appealed. Paula and James had not then visited their daughter regularly and had requested a restart to visitation. Despite the courts finding of no further reunification efforts, DCF permitted visitation to resume. Nonetheless, when Paula and James missed a visit, visitation with Jamie ceased by May, 1998.
Paula testified to the emotional difficulties of visitation and how upset she was to leave her child behind at the end of visits. She stated that to avoid such pain, they did not always visit. The DCF social worker testified to the erratic nature of the visitation, the difficulties with transportation and the periods of time, such as from September to November of 1997, when he did not have any way to contact the parents. While the court can understand the anguish of a parent who cannot face the fact that a child has been removed or the pain caused by seeing the CT Page 3940 child, the court cannot excuse the parents failure to visit. Both parents also claim DCF did not help them sufficiently. Nonetheless, from Jamie's point of view, in order to maintain a relationship with her parents, she needed to see her parents weekly. As has been stated elsewhere:
 "But, ultimately, adults who bring a child into this world owe that child a huge responsibility, regardless of how indifferent DCF may seem." In re Elizabeth Joy, Superior Court, Docket No. H14-CP95-000491 A, Child Protection Session, October 15, 1998. (Shuman, J.). Internal citations omitted.
The court concludes from the evidence that the parents active substance abuse interfered with their ability to place their child and the need for regular visitation ahead of their addiction.
Paula recounted her feelings of growing desperation about her life and ongoing drug use in her detailed testimony about her referral to the long term in-patient drug abuse program at Trinity Glen. By June, 1998, she was living at the YWCA shelter in Hartford and had lost her job. She had lost everything, including her self-respect, she stated. Because of her drug use, she knew she was going to be asked to leave the Y. She called the substance abuse program at Trinity Glen and was told she needed a physical and drug screen. She had used drugs just hours before her call and could not have the physical and drug screen for another seventy-two hours. The Y required her to remain in the shelter without leaving for five days, the bed was held for her and she was able to go after her physical exam. She stated she had to walk to the building in which the physical was performed, an area of Hartford not good for substance abusers to be in, but that she made it. On August 13, 1998, she was admitted and she has remained in the Trinity Glen program since that time. She testified that she was just reaching her six month anniversary there. When that occurs, she will be making plans for her discharge, but that she knew she needed some more time there. She testified that she would not be ready to care for her child for another six months to a year, if that.
James's situation and efforts to deal with his ongoing substance abuse problem show less promise than Paula's efforts. He was actively using drugs and alcohol from 1997 to October of 1998. DCF had referred him for substance abuse assessment and for treatment, with which he did not comply. James had been arrested CT Page 3941 for drug related offenses and was referred to an Alternative to Incarceration program for drug treatment in March, 1997. He stopped attending on October 31, 1997 and violated other rules of the program as well. Throughout the pendency of his daughters case, James has also made it clear to DCF that he did not welcome their.
On October 29, 1998, James became involved with the Manchester Memorial Hospital outpatient substance abuse treatment program called the Steps Program. A counselor from the program testified that James had been attending, has been compliant with the program and has had no positive drug screens. He has been seen by a psychiatrist connected to the program and has been diagnosed as suffering from bi-polar disorder.[3] He also attends self-help groups such as AA in the community four times a week. The counselor stated that initially James did not realize he needed to attend so frequently, but now understands. He is taking classes to secure his high school diploma.
 3. The Psychological Evaluations
Both Paula and James as well as their relationship with Jamie was assessed by the court appointed psychologist on two occasions, October 21, 1998 and February 23, 1999. As to James G., the father, Dr. Meier concluded:
 "Although he expressed a desire to change his life style, there are few specific actions, at least at this time, that reflect differences from past efforts. He has not engaged in any consistent substance abuse treatment, although he has attended some AA and NA groups. Past efforts at treatment have all ended prematurely. Unless his commitment is more fully demonstrated, and he is willing to enter a structured treatment program, the prognosis with regard to the substance abuse remains poor."
Dr. Meier concluded that James G. lacked insight and understanding of the needs of the child. He testified that it was "very unlikely that there would be significant rehabilitation so that he could care for a child." He noted that the child did not recognize James as his father and that there was no ongoing parent-child relationship.
Paula K. and her relationship with Jamie was evaluated on February 23, 1999. At that time, Dr. Meier concluded that Paula's CT Page 3942 commitment to her current course of treatment was greater than she had exhibited to any such program in the past. She is receiving medication for her anxiety disorder, from which she has suffered for a long period of time and which has only recently been diagnosed and treated. He was also aware that she had been diagnosed with Attention Deficit Disorder, (ADD). He found mother to be appropriate with her daughter, who appeared to have only vague memories of Paula, although after an initial strangeness they interacted well. His major concern, he testified at trial, was the future and unknown issue of whether the changes Paula is planning to make will be successful. This "will not be known until she returns to the community and must deal with day-to-day stressors and problems. It is difficult to make a reasonable prognosis at this time without such a test of her desire and will." He testified that the best predictor of the future is still the past and that Paula had repeated relapses in the past, although she had never been in intensive inpatient treatment. He also found that there was no ongoing parent-child relationship between Paula and her daughter.
 4. Jamie G., the child.
Jamie's foster mother testified concerning Jamie's placement with her and her family. She stated that when Jamie came as a six-month old, she was not sitting up and not eating any solid food. She was unable to consume more than two ounces of formula at one time and cried much of the time. She stated it took about four weeks before the child was able to drink six to eight ounces of formula at a time and had begun to eat baby food. She also took the child for Birth to Three services, as she was delayed in some areas developmentally. Those services have since been discontinued as unnecessary. Initially, the foster mother welcomed the parents into the home for visitation and they came for three or four visits between April to August of 1997. She said that although the first visit went well, the parents began to come late and much of the time was spent talking to her about their problems, rather than spending time with the baby. She stated that they did not ask detailed questions about how Jamie was progressing emotionally, her needs or the details of the Birth to Three program. The last time the parents were there was for Jamie's first birthday on August 31, 1997. She testified that the parents were two hours late, although Paula claimed it was only fifteen minutes.
The child's foster mother stated that Jamie has become part CT Page 3943 of her family. Jamie is a happy well-adjusted two year old, who is thriving. She also has another foster child almost Jamie's age and a third foster child who is now a year old. She and her husband would like to adopt Jamie, if possible. Jamie considers her foster mother to be her mother and Dr. Meier in his evaluation found that she was the child's psychological parent, the person to whom the child looks to meet her day-to-day needs.
 B. ADJUDICATION 1. Reasonable Reunification Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, . . . provided that such finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes § 17a-112
(c)(1). As previously indicated, the court has made this finding for both parents on March 1998 when the parents did not attend the hearing on Jamie's extension of commitment to DCF. Counsel for Paula argues that DCF made no effort to refer Paula or James to appropriate services and that Paula had to find service sources on her own. Counsel also argues that the removal of the child from her mother was a direct consequence of DCF's failure to assist the family in locating suitable housing. Those arguments, while appealing, ignore the drug-addicted state of the parents's lives and the chaos, both personal and emotional, that their addiction created in their lives. The court concludes from the clear and convincing efforts that prior to the determination that further reunification efforts were not required, DCF made minimal reunification efforts.
While the court expects a more focused, energetic and dedicated effort on the part of social workers to assist parents than the effort made here, the court does not find the efforts that were made inadequate. Paula's own testimony about her unwillingness to use rent vouchers for locating housing is but one example of the resistance Paula and James showed to efforts to help them. The social worker also testified that despite his suggestions to relocate closer to their daughter and his office, the parents persisted in relocating to the Manchester area, where their unreliable car and the extent of the distance made transportation considerably more problematic. From this and other testimony, the court finds that the parents in 1997 and 1998 were CT Page 3944 unwilling to accept such assistance as DCF offered them. It remains true that the extent and scope of DCF referrals and efforts to assist parents is in part dependent on the parents own responses and utilization of the services. Through 1997 and much of 1998, both parents were resistant to services and by their continued drug use demonstrated the lack of effectiveness of them. DCF is not required to make needless efforts where parents do not, at a minimum, indicate their commitment and interest. While Paula intermittently up to the time of the filing of the termination petition on May 8, 1998 showed some interest, James G. had shown none.
 2. Adjudicatory Findings
In the petition, DCF alleges that the child has been abandoned by the parents in the sense that the parents have failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. Also, DCF alleges the child was previously adjudicated neglected and that each parent has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. The last allegation is that there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.
The court concludes from the clear and convincing evidence, that as of May 8, 1998 under the statutory meaning of the term, both parents had abandoned their daughter. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." Inre Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 14,438 A.2d 801 (1981). While Paula demonstrated some interest in Jamie, that interest has been sporadic and not sustained. As has been stated: "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of "interest, concern or responsibility for the welfare of a child."In re Luke G., 40 Conn. Sup. 316, 323, 498 A.2d 1054 (1985); Inre Migdalia M., 6 Conn. App. 194, 208-209, 504 A.2d 532 (1986). CT Page 3945 These are all actions which Paula failed to take, as a result of her continued substance abuse. James never showed even a sporadic independent interest in his daughter, always following Paula's lead.
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M. 6 Conn. App. 194,203, 504 A.2d 532 (1986). See also: In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984). Based on clear and convincing evidence, the court concludes further that both parents have failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of their child, they could assume a responsible position in Jamie's life. Connecticut General Statutes § 17a-112
(c)(3)(B). Paula has begun the process of drug and alcohol rehabilitation, but cannot complete the process in a time consistent with her daughters needs. Her recovery is fragile and has not been tested in the community as yet. The court concludes, that considering Jamie's age and permanency needs, such rehabilitation, if it occurs, will be too late for Jamie. James G.'s rehabilitation, the court concludes, has not yet been demonstrated in any way and the clear and convincing evidence is that he has not rehabilitated.
Jamie was placed in foster care on March 9, 1997, just over two years ago. She was then six months old. Since that time, her father has demonstrated no measurable progress toward rehabilitation or any compliance with court-ordered expectations. Her mother has taken some steps. However, Jamie simply cannot wait any longer for the rehabilitation of her biological parents, as she has immediate and strong needs for permanency.
The third ground alleged is that neither parent has an ongoing parent-child relationship with Jamie. Dr. Meier in his evaluation of each of the parents with Jamie found that there was no such relationship and the court credits his opinion. The cases have held that:
 "It is reasonable to read the language of "no on-going parent-child relationship to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that CT Page 3946 relationship, so that despite its former existence it has now been displaced. In either case, the ultimate question is whether the child has no present memories or feelings for the parent." In re Juvenile Appeal (Anonymous), 177 Conn. 648, 670, 420 A.2d 875 (1979).
Jamie has no present memories or feelings for her biological parents and there is no ongoing relationship.
Also required for adjudication is whether or not the facts and circumstances concerning the termination grounds had existed for more than one year prior to the adjudicatory date, in this case May 8, 1998. The court answers that question in the affirmative as to all three counts.
 C. REQUIRED FINDINGS
The court makes the following factual findings based upon the clear and convincing I evidence required by Connecticut General Statutes § 17a-112 (e):
1) As previously found, appropriate and timely services were provided by DCF, including casework services, visitation, drug and alcohol assessment referrals and referrals to parenting education.
2) As noted above, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible, prior to the determination that further efforts were no longer appropriate.
3) DCF set reasonable and realistic goals as evidenced by the court-ordered expectations for both parents in order to reunify the family. Neither parent was able to comply with the expectations and remain drug or alcohol free for any period of time.
4) The feelings and emotional ties of the child with respect to the parents, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties. Jamie does not know her parents. Her psychological parent is her foster mother, with whom she has resided for two years. She has prospered there. CT Page 3947
5) Finding regarding the age of the child. Jamie is two years and seven months old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return the child to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. While both James and Paula have made recent efforts since August of 1998 to adjust their circumstances, those efforts come too late for their daughter.
7) Finding regarding the prevention of the parents from having a meaningful relationship with their child. While the parents claim that economic circumstances and the failure of DFC to effectively assist them contributed to the loss of their child and prevented them from maintaining contact with their child, the court cannot so find, as previously noted. DCF has taken adequate steps to encourage Paula and James to have a meaningful relationship with Jamie and to rehabilitate. As found above, many of their transportation and financial difficulties related to the choices the parents made concerning where to live and how to spend the precious financial resources they did have. The court concludes, from the evidence, that the priority for both parents was unfortunately continued substance abuse, which made other goals unattainable.
 D. DISPOSITION
Jamie has been in foster care for more than half of her life. Her mother has made commendable progress, but will not be in a position to care for her for at least six months to a year and her recovery has not yet been tested. Her father has just begun drug treatment. Further relapses are possible and part of the projected future course of all substance abusers. Such relapses would put Jamie at serious risk. Jamie is bonded to her present caretakers and has done well in their home. She requires permanency for her future. Had the parents rehabilitated to their present state earlier, Dr. Meier testified that his recommendations might have been different. But unfortunately they CT Page 3948 did not. While the parents would like to transfer the blame for that failure on DCF and its claimed failure to adequately assist them, such denial of their own parental responsibilities is not adequate for the court or for addressing their child's of their own parental responsibilities is not adequate for the court or for addressing their child's needs. Dr. Meier testified as to the urgency of permanency for young children and established one year from the time of placement as the time when such decisions should be made. The court acknowledges the "deleterious effect of prolonged temporary care of abused and neglected children." In reJuvenile Appeal (84-CD), 189 Conn. 276, 455 A.2d 1313 (1983). The Appellate Court has noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL., BEYOND THE BESTINTERESTS OF THE CHILD 99 (1979).
Based upon the foregoing findings, the court finds that it is in the best interests of Jamie that the rights of her biological parents be terminated. The court orders that a termination of parental rights enter with respect to Paula H. and James G. The Commissioner of the Department of Children and Families is hereby appointed the child's statutory parent. The court further orders that a permanency plan for Jamie be submitted within ninety days. A review plan for her shall be filed in accordance with state and federal law.
Barbara Quinn, Judge Child Protection Session
[2] There was much testimony concerning who made the initial referral and what the social worker did to ensure the success of the referral, including whether he informed Paula that she needed to call to initiate the process. Given Paula's own testimony, the court concludes that even if everything that possibly could have been done by DCF to facilitate this and other referrals, until Paula and James were committed to a course of personal action to address their substance abuse, such efforts would have been unavailing.
[3] The court notes that this is consistent with his adolescent diagnosis of manic depression, as bi-polar disorder is the more recent designation assigned to his condition.
CT Page 3949